GLANCY PRONGAY
      & MURRAY LLP
JOSHUA L. CROWELL (295411)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495
jcrowell@glancylaw.com

*Liaison Counsel for the Public
School Retirement System of the
School District of Kansas City,
Missouri and Liaison Counsel
for the Proposed Class*

LABATON SUCHAROW LLP
JAMES W. JOHNSON (*pro hac vice*)
MICHAEL H. ROGERS (*pro hac vice*)
MATTHEW J. HRUTKAY (297485)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
mhrutkay@labaton.com

*Attorneys for the Public
School Retirement System of the
School District of Kansas City,
Missouri and Lead Counsel
for the Proposed Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANCOUVER ALUMNI ASSET HOLDINGS INC., Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>            v.<br><br>DAIMLER AG, MERCEDES-BENZ USA, LLC, DIETER ZETSCHE, BODO UEBBER, and THOMAS WEBER,<br><br>            Defendants. | Case No. 16-cv-02942-SJO-KS<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge: Hon. S. James Otero |

| | |
|---|---|
| 1 | MARIA MUNRO, Individually and on Behalf of All Others Similarly Situated, | Case No. 16-cv-03412-SJO-KS |
| 2 | |
| 3 | Plaintiffs, |
| 4 | v. |
| 5 | DAIMLER AG, MERCEDES-BENZ USA, LLC, DIETER ZETSCHE, BODO UEBBER, and THOMAS WEBER, |
| 6 | |
| 7 | Defendants. |

# **TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ........................................................................ 2

II.  JURISDICTION AND VENUE ................................................................. 6

III. PARTIES ..................................................................................................... 7

    A.   Lead Plaintiff ...................................................................................... 7

    B.   Defendants ........................................................................................... 7

IV.  FACTUAL BACKGROUND AND SUBSTANTIVE
     ALLEGATIONS ......................................................................................... 11

    A.   Diesel Cars Were a Cornerstone of Daimler's Growth ..................... 11

    B.   Regulators Enacted More Stringent Emissions Standards
        After Recognizing the Threats to Human Health and the
        Environment Posed by Diesel Pollutants ........................................... 13

    C.   The Threat to Daimler's Corporate Strategy and Daimler's
        Response to Tightening Emissions Standards for Diesel
        Vehicles ............................................................................................... 15

        1.   Daimler Devoted Resources to Meeting Stringent
             Emissions Regulations in the U.S. and the European
             Union ....................................................................................... 15

        2.   Regulatory Approval Was Necessary for Daimler to
             Sell Its Diesel Cars and Vans ................................................. 17

        3.   Daimler's BlueTEC Emissions Control System Allowed
             Its Vehicles to Pass Regulatory Emissions Tests ................... 19

        4.   Calibration Allowed Daimler to Design BlueTEC
             Emissions Control Systems to Perform Effectively in
             Formal Testing, but to Disengage in Road-Use, Normal
             Driving Conditions ................................................................. 20

        5.   Daimler Diesel Cars Use a Defeat Device ............................. 23

    D.   Diesel Emissions and Defeat Devices Were Thrust Into the
        International Spotlight, and Allegations Against Daimler
        Emerged ............................................................................................... 25

        1.   Volkswagen Was Found to Use Defeat Devices ..................... 25

        2.   Despite Evidence that Daimler Knew that Certain
             BlueTEC Vehicles Were Impermissible, the Company
             Adamantly Denied the Use of Defeat Devices ....................... 26

        3.   Daimler Acknowledged that BlueTEC Activated Only
             at Temperatures Above Fifty Degrees Fahrenheit, but

|   |   |   | Continued To Deny that Daimler Employed a Defeat Device | 27 |
|   | E. |   | Tests Confirm That Daimler's BlueTEC Vehicles Emit Under Normal Use Significantly Higher Emissions than Permitted Pursuant to U.S. and European Regulations | 29 |
| V. |   |   | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT | 32 |
|   | A. |   | Pre-September 2015 Misleading Statements and Omissions | 32 |
|   |   | 1. | 2011 Annual Report Misleading Statements and Omissions | 32 |
|   |   | 2. | 2012 Annual Report Misleading Statements and Omissions | 33 |
|   |   | 3. | September 11, 2013 Misleading Statements and Omissions | 34 |
|   |   | 4. | 2013 Annual Report Misleading Statements and Omissions | 35 |
|   |   | 5. | 2014 Annual Report Misleading Statements and Omissions | 37 |
|   | B. |   | Post-Defeat Device Allegations Misleading Statements and Omissions | 38 |
|   |   | 1. | September 2015 Misleading Statements and Omissions | 38 |
|   |   | 2. | Q3 2015 Earnings Call Misleading Statements and Omissions | 40 |
|   |   | 3. | January 2016 Press Release Misleading Statements and Omissions | 41 |
|   |   | 4. | February 2016 Misleading Statement and Omission | 42 |
|   |   | 5. | 2016 Annual Shareholder Meeting Misleading Statements and Omissions | 43 |
|   |   | 6. | 2015 Annual Report Misleading Statements and Omissions | 43 |
| VI. |   |   | THE TRUTH EMERGES | 45 |
| VII. |   |   | THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE | 49 |
| VIII. |   |   | LOSS CAUSATION | 50 |
| IX. |   |   | CONTROLLING PERSON ALLEGATIONS | 54 |

X.      CLASS ACTION ALLEGATIONS ............................................................56

XI.     LEAD PLAINTIFF AND CLASS MEMBERS ARE  ENTITLED TO A PRESUMPTION OF RELIANCE......................................................58

XII.    CAUSES OF ACTION ......................................................................60

        COUNT I Asserted Against All Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder .......................................................60

        COUNT II Asserted Against the Individual Defendants and Daimler for Violations of Section 20(a) of the Securities Exchange Act of 1934 ..............................................................................63

XIII.   PRAYER FOR RELIEF........................................................................65

XIV.    JURY DEMAND ..................................................................................65

Court-appointed Lead Plaintiff the Public School Retirement System of the School District of Kansas City, Missouri ("Lead Plaintiff" or "Kansas City"), individually and on behalf of all persons and entities that, during the period from February 22, 2012 through April 21, 2016, both dates inclusive, (the "Class Period"), purchased or otherwise acquired Daimler AG American Depositary Receipts and were damaged thereby (the "Class"),[1] by and through its attorneys, as and for its Consolidated Class Action Complaint (the "Complaint") asserting claims against Daimler AG ("Daimler" or the "Company") and the individual defendants named below (together with Daimler, the "Defendants"), alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.

Lead Plaintiff's information and belief concerning matters other than itself and its own acts are based upon, among other things, a review and analysis by Lead Plaintiff's counsel of: financial reports available to the investing public through Daimler's corporate Investor Relations website; regulatory filings and reports; securities analysts' reports and advisories about the Company; press releases and other public statements issued by Defendants; media and news reports related to Daimler; data and other information concerning Daimler securities; other publicly available information concerning the Company and the Individual Defendants; an investigation conducted by and through Lead Plaintiff's attorneys and their investigators; and consultation with an industry expert in automotive engineering, diesel engine design and operation, diesel engine emissions standards, and diesel emissions control systems. Lead Plaintiff

---

[1] Excluded from the Class are: (i) Defendants; (ii) the present and former executive officers of Daimler AG and its wholly owned subsidiaries; (iii) the present and former members of Daimler's Board of Management; (iv) members of the immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)) of the foregoing excluded persons; (v) any entity in which any Defendant has or had a controlling interest; (vi) any subsidiary or affiliate of Daimler AG; (vii) and the legal representatives, heirs, successors, or assigns of any of the foregoing excluded individuals and entities.

believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   This is a federal securities class action brought by Lead Plaintiff on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Daimler American Depositary Receipts[2] during the Class Period seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Daimler established a sponsored Level I ADR program in September 2010, which trades on over-the-counter markets in the United States; Deutsche Bank Trust Company Americas serves as the acting depository bank for the ADRs at issue here: those utilizing the ticker symbols DDAIF and DDAIY (the "Daimler ADRs").

2.   This action arises out of Defendants' misrepresentations and fraudulent course of conduct surrounding Daimler's diesel car and van emissions control systems, also known as BlueTEC.  The Company claimed throughout the Class Period that its BlueTEC passenger and light-duty vehicle offerings were "the cleanest diesel cars in the world," and that BlueTEC made its "diesel [cars] as clean as a state-of-the-art gasoline engine."

3.   Despite these affirmative statements, however, numerous tests performed by regulatory agencies and non-governmental organizations during and after the Class Period demonstrated that when tested in *on-road conditions under normal use*, the Company's supposedly "clean diesel" vehicles using BlueTEC were spewing significantly more exhaust emissions than permitted

---

[2] An American Depository Receipt ("ADR") is a U.S. dollar denominated form of equity ownership in a non-U.S. company.  It represents the foreign shares of a company held on deposit by a custodian bank in the company's home country and carries the corporate and economic rights of the foreign shares, subject to the terms specified on the ADR certificate.

pursuant to regulations enacted by the European Union (the "E.U.") and the United States.

4.   Moreover, when Daimler was scrutinized publicly regarding rumors of these practices, Defendants denied that the Company's vehicles used a "defeat device"—a technological manipulation designed specifically to meet regulatory emissions requirements *in a testing environment*—even though they knew that BlueTEC vehicles' emissions control systems had been engineered to be fully operational *only* in ambient temperatures above 50°F (10°C), *i.e.*, in an ideal testing environment divorced from the realities of on-road, normal use driving conditions in much of the world, including the United States and Europe.

5.   Diesel emissions were thrust into the public spotlight on September 18, 2015, when the U.S. Environmental Protection Agency (the "EPA") issued a notice of violation of the Clean Air Act to Volkswagen AG ("VW") after finding that VW had programmed its diesel passenger vehicles to detect when those vehicles were being tested for emissions compliance, and to activate emissions control systems *only* during these testing scenarios.  The use of such a defeat device is a violation of U.S. regulations.  The EPA specifically found that the VW vehicles using defeat devices to pass requisite regulatory testing emitted up to 40 times higher exhaust emissions than permitted under applicable regulations.

6.   Almost immediately, several sources reported that Daimler had also manipulated the software governing its diesel passenger car emissions control systems such that they were engaged (*i.e.*, actually reducing raw diesel emissions) under conditions present in controlled regulatory testing, but were disengaged or deactivated under many conditions present during on-road, normal use driving. The Company immediately and emphatically denied that Daimler vehicles used defeat devices or otherwise manipulated emissions control systems to pass regulatory emissions testing.   Nevertheless, on this news, shares of Daimler

ADRs dropped approximately 7% on September 22, 2015 on heavy trading, with DDAIF falling $5.38 per share and DDAIY falling $5.44 per share.

7.     Moreover, even as Daimler continued to deny the use of defeat devices and manipulation of emissions control systems, it became clear that the Company had *specifically designed* BlueTEC to deactivate or disengage diesel emissions controls when ambient temperatures fell below approximately 50°F. Indeed, 50°F was neither accidental nor arbitrary, but instead was chosen to take advantage of highly regulated emissions testing protocols (well-known to Defendants and Daimler engineers) which tested emissions compliance only in ambient temperatures near or above 70°F.  The fact that Daimler diesel cars' emissions control systems were deactivated below 50°F (a common temperature in many of the Company's key European and American markets) demonstrated that Daimler's emissions control systems were not actually reducing diesel emissions under conditions present during a significant percentage of on-road, normal use driving.

8.     Following the initial accusations against Daimler made in September 2015, numerous governmental regulatory authorities and other non-governmental organizations disclosed the results of their independent investigations into the actual volume of pollutant emissions from diesel cars and light-duty vehicles, including several Daimler models.   Nearly every report found that, when measuring emissions in conditions that deviated from those used in formal, regulatory testing (but well within the range of on-road, normal use), Daimler diesel vehicles emitted pollutants many multiples higher than permitted under applicable regulations.

9.     Of particular concern to the EPA and other emissions regulatory authorities was nitrogen oxides ("NOx"), some of the most concerning primary components of diesel exhaust.  NOx are subject to increasingly strict regulatory

limits, primarily because when NOx emissions react with ambient air in the presence of sunlight, they form ground-level ozone, one of the key components of smog. Although smog generally presents itself in the form of an unsightly brown soup of pollutants, it has also been shown to cause and aggravate serious respiratory problems, and can increase the risks of certain cancers.

10.    The findings of the governmental regulatory authorities and other non-governmental organizations were important because they demonstrated that while Daimler's vehicles may have passed regulatory emissions tests, they were not complying with the clear intent of the applicable NOx regulations. Regulators did not merely want diesel vehicles to minimize NOx emissions during testing—they wanted the vehicles to emit minimal NOx on the open road.

11.    As pressure began to mount, Daimler fell under increasing regulatory scrutiny. On February 26, 2016, the EPA requested that the Company supply information—including emissions testing results—concerning Daimler vehicles' emissions control systems.

12.    The Company's denials continued, and regulatory scrutiny increased. On April 21, 2016, the Company announced that the U.S. Department of Justice ("DOJ") had requested Daimler to conduct an internal investigation to "review its certification and admissions process related to exhaust emissions in the United States."

13.    That same day, the German Federal Motor Transport Authority, also known as KBA, announced that at least two different Mercedes-Benz models used defeat devices, and that the authority believed that those defeat devices were not justified by the Company's previous excuses that those defeat devices were necessary to protect the vehicles' engines.

14.    As a final punch, multiple news outlets reported on April 22, 2016 that, along with other German automakers, Daimler was recalling 247,000

vehicles in Germany to fix emissions issues by "tweak[ing] diesel engine software [] blamed for causing high pollution."   Alexander Dobrindt, German Transport Minister, made clear that the recall was to redress the findings disclosed in the April 21, 2016 KBA report (that Daimler had used defeat devices), stating that the recall was intended to "fix a device that turns off emissions controls at particular temperatures as a means to protect the engine," but that the "temperature thresholds at which the controls shut down weren't justified."   Over the course of April 21 and 22, 2016, shares of Daimler ADRs fell approximately 5%, with DDAIF falling $3.79 per share and DDAIY failing $3.94 per share.

## II.   JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as Daimler's subsidiary responsible for testing and regulatory affairs conducts business in Long Beach, California, from offices located within this District, and a significant portion of the Defendants' actions, and resulting damages, took place within this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

### A.   Lead Plaintiff

19.   Lead Plaintiff Public School Retirement System of the School District of Kansas City, Missouri was created in 1944 and provides retirement and other benefits for employees of the Kansas City, Missouri School District and certain other public employers.   As of July 5, 2016, Kansas City oversaw approximately $668 million in assets for approximately 3,500 members and their beneficiaries.   Kansas City purchased Daimler ADRs during the Class Period, as set forth in the certification previously filed with the Court (*see* ECF No. 15-1), and suffered damages as a result of the federal securities law violations alleged herein.   By order dated July 20, 2016, the Court appointed Kansas City as the Lead Plaintiff in this action.

### B.   Defendants

20.   Defendant Daimler, through its subsidiaries, develops, manufactures, distributes, and sells cars, vans, trucks, and buses worldwide.   The Company is incorporated in Germany, and maintains its principal offices in Stuttgart, Germany.   Daimler operates in the United States through several American subsidiaries, including: Mercedes-Benz Research & Development North America, Inc.; Mercedes-Benz USA, LLC; Mercedes-Benz Vans, LLC; Mercedes-Benz Financial Services, USA LLC; Daimler Trucks North America LLC; and Mercedes-Benz US International.[3]

21.   Defendant Mercedes-Benz USA, LLC ("MBUSA") is incorporated in the State of Delaware, and since 2015 maintains its principal office at 303 Perimeter Center N., Atlanta, Georgia 30346.   Throughout the majority of the Class Period, MBUSA maintained its principal offices at 1 Mercedes Drive,

---

[3]   The terms "Mercedes-Benz" and "Mercedes" will be utilized interchangeably herein, and refer to those vehicles produced by Daimler's predecessor entities under the Mercedes-Benz brand.

Montvale, New Jersey 07645.  Founded in 1965, MBUSA distributes, markets, and provides customer service for, *inter alia*, all sales of Mercedes-Benz cars and Sprinter light-duty vehicles in the United States.  At all relevant times throughout the Class Period, MBUSA was a wholly owned subsidiary of Daimler.

22.  Defendant Dr. Dieter Zetsche ("Zetsche") is and was, at all times throughout the Class Period, the Chairman of the Board of Management of Daimler AG and Head of Mercedes-Benz Cars Division.  After studying electrical engineering, Zetsche graduated from the University of Karlsruhe as an engineer, and joined the research department of the Company (then named Daimler-Benz AG).  In 1982, Zetsche obtained a doctorate in engineering from the University of Paderborn.  Since originally joining Daimler in 1976, Zetsche has held a wide array of positions within the Company, including but not limited to: President of Mercedes-Benz Argentina; President of Freightliner (Daimler's U.S. subsidiary that manufactures heavy-duty trucks, all or most of which utilize diesel engines); Chief Engineer of Development in Mercedes-Benz's Passenger Cars Business Unit, and CEO and President of the Chrysler Group.  These various roles exposed Zetsche to many aspects of operations at both Daimler and many of its subsidiaries, and provided Zetsche unprecedented exposure to the Company's design philosophies and priorities, and technical capabilities of the Mercedes vehicles that utilize diesel emissions control systems, including but not limited to BlueTEC.  Notably, Zetsche has been a Member of Daimler's Board of Management since at least 1995.

23.  Zetsche made several false and misleading statements throughout the Class Period as a signatory of numerous Company annual financial reports, and in response to allegations that Daimler used a defeat device or otherwise manipulated emissions control systems.

24.   Defendant Bodo Uebber ("Uebber") is and was, at all times throughout the Class Period, a Member of the Board of Management of Daimler AG, and is responsible for Finance & Controlling and Mergers & Acquisitions for Daimler AG.  He is also responsible for Daimler Financial Services Division, one of Daimler's wholly owned subsidiaries.  Uebber graduated from the Technical University of Karlsruhe after studying engineering and economics.  He has held numerous positions of increasing responsibility since he originally joined one of Daimler's corporate predecessors in 1985, including CFO and Chairman of the Board of Management of DaimlerChrysler Services AG, prior to being appointed as a Member of the Board of Management of Daimler in 2003.

25.   Uebber made several false and misleading statements throughout the Class Period as a signatory of numerous Company annual financial reports, and in response to allegations that Daimler used a defeat device or otherwise manipulated emissions control systems.

26.   Defendant Dr. Thomas Weber ("Weber"; together with "Zetsche," and "Uebber," the "Individual Defendants") is and was, at all times throughout the Class Period, a Member of the Board of Management of Daimler AG and is responsible for Group Research & Mercedes-Benz Cars Development.  After studying mechanical engineering, Weber graduated from the University of Stuttgart in 1980 as an engineer, and subsequently obtained a doctorate from the same university in 1987.  Since originally joining the Company in 1987, Weber has held several positions at Daimler, including Director and Manager of several Company engine manufacturing plants, Manager of one of the Company's passenger vehicle production facilities, and Vice President and Speaker for one of Mercedes-Benz's models series.  These various roles exposed Weber to many aspects of operations and Mercedes-Benz.  Notably, Weber has been a Member of Daimler's Board of Directors since 2003.

27.     As Head of Mercedes Research and Development, Weber was instrumental to the development of BlueTEC and the Company's efforts to meet emissions standards.  Lauding Weber's work in this capacity, the Chairman of the Company's Supervisory Board stated that Weber "has shaped Research & Development at Daimler, and primarily at Mercedes-Benz Cars, for more than thirteen years," and that Weber has "laid important foundations, [] renewed the entire product portfolio of passenger cars, and has prepared the company for the future of mobility."  He also stated that Weber "has [] played a major role in the present success of Mercedes-Benz Cars."

28.     Weber made several false and misleading statements throughout the Class Period as signatory of numerous Company annual financial reports.

29.     Each of the Individual Defendants:

      (a) directly participated in the management of the Company;

      (b) was directly involved in the day-to-day operations of the Company at the highest levels;

      (c) was privy to confidential proprietary information concerning the Company and its business operations;

      (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

      (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

      (f) was aware of, or with deliberate recklessness disregarded, the fact that the false and misleading statements were being issued concerning the Company; and/or

      (g) approved or ratified these statements in violation of the federal securities laws.

30.     Daimler is liable for the acts of the Individual Defendants and the Company's other employees (and/or agents) under the doctrine of *respondeat superior* and common law principles of agency, because all of the wrongful acts complained of herein were carried out within the scope of any such employees' employment responsibilities and obligations.

31.     The scienter of the Individual Defendants and the Company's other employees (and/or agents) is similarly imputed to Daimler under *respondeat superior* and agency principles.

## IV.     FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.     Diesel Cars Were a Cornerstone of Daimler's Growth

32.     Diesel engines have played an instrumental role in Daimler's growth. Mercedes-Benz introduced its first diesel car, the 260D model sedan, in 1936. Since then, the Company has pursued a corporate strategy focusing on diesel engine vehicles as a greater percentage of its fleet compared to many of its competitors because diesel engines deliver more torque (the amount of power an engine puts out at any specific engine speed) and significantly better fuel economy than comparable gasoline engines, among other reasons.

33.     Daimler's corporate pursuit of the diesel car market thus benefited from the tightening of emissions regulations on carbon dioxide, an exhaust gas that is produced in significantly greater levels in gasoline vehicles of comparable capability.   Beginning in the 1990s, Europe and the United States reduced drastically the acceptable levels of carbon dioxide emissions from vehicles. Diesel vehicles thus became an attractive alternative to gasoline, since gasoline-powered engines emit significantly greater levels of carbon dioxide than diesel-powered vehicles for the same net power output.

34.     While Japanese and U.S. automakers sought to meet these stringent carbon dioxide standards primarily by focusing development on hybrid and

electric cars, Daimler (and several other major German automakers) lobbied strongly to incentivize the sale of diesel engine passenger vehicles.  Daimler's efforts were successful; many European nations offered (and continue to offer) subsidies and other financial incentives for consumers to choose diesel vehicles. For example, many governments have kept the price of diesel fuel lower than that of gasoline, or offered tax incentives to consumers choosing diesel over gasoline. Simon Birkett, director of Clean Air London, described these changes in the *Taipei Times* as "practically an order to switch to diesel," and noted that "[t]he European car fleet was transformed from being almost entirely petrol to predominantly diesel."

35.     Daimler's long-standing advocacy of diesel vehicles, paired with more stringent regulations focused on gasoline vehicles' emissions, and Daimler's lobbying efforts to make diesel more attractive, allowed the Company to benefit from a dramatic increase in the adoption of diesel cars in the E.U. Whereas diesel cars represented less than 10% of the European car fleet until the mid-1990s, by 2012 approximately 55% of all newly registered passenger vehicles in Europe were diesel.  In some countries, such as Belgium, France, and Spain, diesel adoption was as high as 65% of new passenger car registrations by 2013.

36.     Moreover, Daimler's corporate strategy of focusing on diesel engine vehicles paid off.  By 2011, more than 60% of the Mercedes-Benz's cars sold in Europe used diesel engines, and therefore Daimler's increased diesel car sales in Europe had a significant positive impact on Daimler's financial position and profitability.   By 2012, nearly 35% of the Company's revenues came from countries in Western Europe (including high diesel adoption countries such as Belgium, France, and Spain).

37.     Prior to the Class Period, Mercedes also significantly expanded its sales of diesel cars and light-duty vehicles in the United States.  Daimler publicly declared that the U.S. presented significant further growth potential, especially in light of increasing focus on fuel efficiency and emissions reduction.  The U.S. market also accounted for a substantial portion of Company revenues.  By 2012, approximately 24% of the Company's revenues came from sales in the United States.

38.     But E.U. and U.S. regulators' focus on carbon dioxide emissions shifted following significant increase in market share enjoyed by diesel car manufacturers, including Daimler.  The growing prominence of diesel vehicles subsequently led to tighter regulations on pollutants emitted in significantly greater quantities by diesel engines.

**B.      Regulators Enacted More Stringent Emissions Standards After Recognizing the Threats to Human Health and the Environment Posed by Diesel Pollutants**

39.     Although diesel engines provide more torque and fuel efficiency than their gasoline counterparts (and emit significantly less carbon dioxide than equivalent gasoline engines), diesel engine vehicles in operation nonetheless emit significantly higher levels of a range of pollutants including nitrogen oxides.  In fact, diesel vehicles emit up to four times as much NOx than their gasoline-powered counterparts at the same engine output power levels.

40.     Given the harmful effects of unchecked or unremediated diesel emissions on human health and the environment, and the growing prominence of diesel engine vehicles emitting pollutants dangerous to human health, regulators in the U.S. and the E.U. responded with tightened standards controlling the acceptable levels of NOx emissions.

41.     The United States acted first to significantly curtail NOx exhaust emissions.  The regulations in force prior to and during the Class Period are

known as the Tier 2 regulations, promulgated by the EPA pursuant to the Clean
Air Act of 1970 (and its various amendments).  Tier 2 regulations went into full
effect in 2007 and required automakers to maintain a fleet average of less than 70
mg per mile of NOx emissions across their diesel engine passenger and light duty
fleet throughout the vehicles' useful lives, with even more stringent limitations
for the first 50,000 miles of a vehicle's life.

42.    The implementation of Tier 2 regulations in the U.S. was a major
threat to Daimler's diesel business strategy.  The preceding regulations in the U.S.
had a NOx standard in the mid-1990s to mid-2000s of 1.25 g (1,250 mg) per mile
for most diesel cars, so *Tier 2 reduced the average permissible NOx exhaust
emissions ceiling for any given automaker's fleet by almost 95%*.

43.    In Europe, vehicle NOx emissions were primarily reduced through
the introduction of Euro 5 and Euro 6 emissions standards (both of which were in
effect for portions of the Class Period).  Under Euro 5 (covering model years
2009-13), cars and light-duty vehicles were required to emit less than 180 mg
NOx per km (equivalent to 289.68 mg NOx per mile).  However, the NOx ceiling
was more than halved under Euro 6 (applicable to model years 2014 through the
present), which required vehicles to emit less than 80 mg NOx per km (equivalent
to 128.74 mg NOx per mile).

44.    The graph below demonstrates just how significantly permissible
NOx  exhaust emissions were reduced from 1994 through the present.



"Emission Limits for Diesel Powered LDVs, NOx, and NMHC in the US (Light−duty vehicles and Trucks) and the EU (Passenger cars and Light commercial vehicles)," *available at* http://transportpolicy.net/index.php?title=Global_Comparison:_Light-duty_Emissions.

### C. The Threat to Daimler's Corporate Strategy and Daimler's Response to Tightening Emissions Standards for Diesel Vehicles

45.     The substantial reduction in NOx emissions required by the implementation of Tier 2 emissions regulations in the U.S. presented a major threat to Daimler's business strategy.  Furthermore, European regulators were also concerned about the levels of NOx allowed under the prevailing Euro regulations.

### 1. Daimler Devoted Resources to Meeting Stringent Emissions Regulations in the U.S. and the European Union

46.     Daimler knew the threat that these increasingly stringent NOx standards posed to their diesel vehicle strategy.  If the Company could not convince regulators in the E.U. and the U.S. that their Mercedes-Benz diesel cars met the applicable standards, Daimler would not be able to sell those vehicles at all.  This was especially important in light of Daimler's long-term plans to make

its diesel cars more popular in the United States. Defendant Weber acknowledged the Company's focus on diesel in the American market when he remarked at the 2008 New York Auto Show that Daimler "want[ed] to make diesel driving popular here [in the U.S.] again – especially for SUVs."

47. The Company was particularly conscious of the development of diesel emissions control systems necessary to comply with future anticipated reductions in regulatory limits of NOx and other exhaust pollutants, noting in its 2005 Annual Report that BlueTEC – then only available in commercial vehicles – would be used in Mercedes' diesel cars, and was "clearly playing a key role in making diesel-operated vehicles more environmentally friendly than ever before."

48. These concerns would continue to garner significant attention within Daimler. The Company's 2013 Annual Report sought to quell investors' concerns by noting that Daimler's Research and Development department's "main projects were the continuous further development of engines with a focus on optimizing fuel consumption and *complying with new emission standards* . . . ." The Company also noted therein that it "expect[ed] to expend an even larger proportion of the research and development budget to ensure the fulfillment of these regulations."

49. Defendants fully understood that compliance with these increasingly stringent emissions regulations presented the potential for material losses to the Company, and therefore to investors. If Daimler could not convince emissions regulators that the Company's diesel vehicles were as clean as they claimed and as clean as new regulations required, Daimler would not be allowed to sell vehicles in the U.S. and E.U. The 2012 Annual Report (and all other annual reports issued by the Company during the Class Period), for example, noted that "[m]any countries have already implemented stricter regulations to reduce vehicles' emissions and fuel consumption, or are now doing so."

50.     Defendant Zetsche demonstrated his understanding that diesel was key to the Company's financial prospects when he told a crowd at the 2006 Detroit Auto Show: "As a powerful, economical and clean drive system, BLUETEC can significantly help American drivers continue to enjoy large, powerful cars for many years to come…. BLUETEC diesel vehicles have the potential to meet the world's most stringent exhaust emissions standards, including those of all 50 US States."  Thus, the Company and Defendant Zetsche were clearly concerned with, and understood the need to satisfy, the 95% NOx emissions reduction which would be required under Tier 2 regulations implemented in 2007.

51.     Likewise, Defendant Weber, a member of the Daimler Board of Management and the head of research and development for Mercedes-Benz cars, echoed Defendant Zetsche, describing BlueTEC in 2006 as "the opportunity we've strived so long for" and noting that the improved diesel emissions control system was one factor which made the U.S. market ripe for diesel technology similar to that being adopted in Europe.

52.     Weber went on in 2008 to make clear that Daimler's overall corporate strategy was heavily dependent on the adoption of its "clean diesel" cars.  At the 2008 New York Auto Show, he noted that "the BlueTEC campaign expresses [Daimler's] ambitious targets for the U.S.," and said that the Company "want[ed] to make diesel driving popular [in the U.S.] again . . . ."

**2.      Regulatory Approval Was Necessary for Daimler to Sell Its Diesel Cars and Vans**

53.     More specifically, Daimler (and any automaker) must obtain a Certificate of Conformity in order to sell and market a vehicle in the U.S. in any given model year.  This is a certification that a particular vehicle model conforms to all applicable emissions requirements for that model year.  In order to obtain a Certificate of Conformity, Daimler must submit vehicle information and data

1    from emissions testing **performed by the Company** (or a certified third party paid

2    by the Company).  The EPA performs independent verification testing on only a

3    small proportion of vehicles (through an auditing process) during this process,

4    and does not otherwise routinely confirm the veracity of emissions testing data

5    submitted by automakers such as Daimler.

6          54.    Similarly, the E.U. requires Daimler (and other automakers) to

7    obtain authorization from a national regulatory authority of a member state before

8    being able to sell that vehicle in Europe; this process is called type approval, and

9    consists of a request from an automaker to the regulator to confirm that a vehicle

10   is in compliance with applicable E.U. emissions requirements.  If the vehicle as

11   tested demonstrates compliance with applicable emissions regulations, the

12   national regulator certifies this, and all E.U. member states must then permit that

13   vehicle to be sold in their domestic markets.

14         55.    Under both sets of regulations, the emissions data required for a

15   vehicle to be certified for sale is based on highly regulated laboratory tests of a

16   vehicle on a dynamometer; in the U.S., this test includes the FTP-75, and in the

17   E.U., it is known as New European Driving Cycle ("NEDC").

18         56.    Pursuant to U.S. regulations, the entire testing environment and

19   specific test protocols for the FTP-75 are controlled.  Thus, Daimler knows that if

20   the EPA seeks to audit or otherwise verify those data from test results that the

21   Company performed, the EPA test will occur indoors at room temperature, most

22   likely at the EPA's test facility in Ann Arbor, Michigan.  The test is performed at

23   a specific barometric pressure in a laboratory, at a temperature between 68-86°F,

24   and consists of a specific series of well-established, publicly available

25   accelerations and decelerations of the vehicle on the dynamometer.[4]

26

27   ───────────────────
     [4]    Indeed, these criteria are so specific, and so well-known within the
28   automotive industry that VW was able to manipulate its emissions control
     software so that it would detect testing by assessing the time the steering wheel

57.     Under Euro standards, the NEDC consists of pre-determined driving cycle performed on a dynamometer in a highly regulated laboratory environment, much like the FTP-75.  The parameters of this test are also publicly available, and well-known to automakers and their engineers.

58.     Thus, at precisely the time that regulations of diesel NOx emissions were becoming increasingly difficult to meet, Daimler knew that it needed to implement BlueTEC in its diesel vehicles in a manner that would beat the relevant emissions standards during testing.   The Company could not fail regulatory emissions tests, and risk being prohibited from selling its vehicles in the U.S. and E.U..

### 3.     Daimler's BlueTEC Emissions Control System Allowed Its Vehicles to Pass Regulatory Emissions Tests

59.     In 2006, Daimler introduced its BlueTEC system in diesel cars precisely to address those growing concerns regarding compliance with the new regulations.   Daimler describes its BlueTEC system as "[a] combination of inner-engine measures to reduce emissions and the treatment of exhaust gases." The Company claims it "improves diesel engines' efficiency by optimizing their combustion, and reduces their emissions through exhaust-gas aftertreatment with [Selective Catalytic Reduction] catalysts."

60.     Although this may have been how the Company claimed BlueTEC worked, the reality is that BlueTEC ultimately needed to be designed only to ***pass highly regulated emissions tests***, not to satisfy those regulations on the open road under normal use.

---

remained in the same position, duration of and specific thresholds for acceleration and deceleration, and other testing protocols.

#### 4. Calibration Allowed Daimler to Design BlueTEC Emissions Control Systems to Perform Effectively in Formal Testing, but to Disengage in Road-Use, Normal Driving Conditions

61.     In designing vehicles to comply with increasingly stringent exhaust emissions regulations (and when programming software that governs the Engine Control Unit and emissions control systems), engineers must balance maximizing power and fuel economy with clean emissions concerns.  This balance is achieved by Daimler's decisions made when designing the requisite software, and calibrating the engine and emissions control system.

62.     Don Hillebrand, former president of the Society for Automotive Engineers, described how these factors interact: "You have power, you have energy [efficiency], you have emissions:  You get to choose two of them."  Jorn Herner, an official with the California Air Resources Board's research division further explains that "[t]he temperatures and pressures under which a diesel engine runs the most fuel efficient and the most peppy are also the conditions that will convert the maximum amount of oxygen and nitrogen into NOx."

63.     An emissions control system, such as BlueTEC, is designed to function as a coordinated system or network of pollutant-reducing components in a vehicle's engine and exhaust system,[5] the operation of which is regulated by a small on-board computer typically called an Engine Control Unit (also known as Electronic Diesel Controls or Engine Controllers).  The Engine Control Unit is part of an overall engine management system, which typically controls, among other factors, the operation of the emissions control system.

64.     In the most recent models of diesel passenger vehicles, there are several primary components of a diesel emissions control systems, including, but

---

[5] 40 C.F.R. § 86.1803-01 defines an emission control system as "a unique group of emission control devices, auxiliary emission control devices ["AECDs"], engine modifications and strategies, and other elements of design designated by the Administrator used to control exhaust emissions of a vehicle."

1    not limited to:  Exhaust Gas Recirculation systems; Diesel Oxidation Catalysts;
2    Diesel Particulate Filters; and Selective Catalytic Reduction systems.

3        65.    Two key components of Mercedes' BlueTEC diesel emissions
4    control systems are essential to  reducing a diesel engine's NOx emissions:  (1)
5    the Exhaust Gas Recirculation system and the (2) Selective Catalytic Reduction
6    system.  In Daimler vehicles, each of these systems is governed entirely by the
7    Engine Control Unit, which is controlled by software engineered by Daimler
8    employees to optimize overall vehicle performance.

9        66.    Importantly, both systems are intended to change their operation
10   depending on various internal and environmental conditions.  Nevertheless, no
11   matter the permutations created by the interaction of these variables, these
12   systems should have been designed *to ensure minimal NOx emissions _under a_*
13   *_wide range of normal operating conditions_*, not to shut off outside the formal
14   testing environment (*i.e.*, at 50°F) and begin spewing diesel exhaust well in
15   excess of regulatory thresholds.

16       67.    Once Daimler determined the design of one of its vehicle's engine
17   hardware, the design of the emissions control system, and the required emissions
18   sensor specifications, it developed the Engine Control Unit software that
19   coordinated and managed the inter-operation of these components.  This software
20   was also designed to take into account various environmental and internal engine
21   conditions   encountered   under   normal   operation,   specifically   including
22   temperature.

23       68.    Once Daimler developed this software, it then calibrated it to ensure
24   that (i) the vehicle would pass regulatory emissions testing (by engaging the
25   emissions control system), (ii) but *also would _disengage_ under a wide variety of*
26   *environmental conditions encountered in normal use (including, among other*
27   *variables, ambient temperature)*, to provide fuel efficiency and performance,

28

while simultaneously ***failing to control*** emission of NOx and other harmful pollutants.

69.    As discussed above, Daimler engineers during the Class Period calibrated diesel cars and light-duty vans so that the vehicles' BlueTEC emissions control systems were only fully engaged at ambient temperatures above 50°F (since testing is always conducted at temperatures above 50°F), even though temperatures below 50°F are common in on-road, normal use driving.

70.    For example, in New York City, during an average year (derived from historical data), the daily mean air temperature falls below 50°F on November 11, and does not rise above that mean daily air temperature until April 6 of the following year.  That is, for close to five months of an average year, a Daimler diesel car or van could be spewing many multiples of the threshold NOx emissions limits permitted by regulations.  This is likewise applicable to many Northern European countries, where severe winter conditions are common and could cause excess emissions from Daimler cars and vans for the majority of the year.  This is hardly an emissions control system designed to ensure regulatory compliance under conditions of on-road, normal use driving.

71.    Thus, Daimler engineers ultimately controlled the process of calibration for Mercedes-Benz diesel cars and light-duty vehicles, in order for the vehicle to perform optimally within the testing constraints derived from applicable regulations.  Passing emissions testing is one of Daimler engineers' primary concerns when calibrating a diesel car or light-duty van, because unlike other variables (such as power), certification of emissions compliance through highly regulated emissions tests is a necessary predicate to regulatory approval for sale.

#### 5.    Daimler Diesel Cars Use a Defeat Device

72.    U.S. and E.U. regulations permit deactivation of variable emissions control systems only under an extremely limited set of circumstances.[6]  Neither the U.S. nor the E.U. permit an emissions control system to perform materially better in a testing scenario than in the real world (corresponding to the operation of the vehicle outside of the testing laboratory).

73.    Under U.S. regulations, an auxiliary emissions control device ("AECD")[7] is a device which activates or deactivates emissions control systems' components on the basis of measured ambient temperature and/or other parameters.   Daimler has acknowledged that the software governing the BlueTEC's Engine Control Unit is an AECD, as it senses the ambient temperature and reduces the effectiveness of the emissions control system below, at, or around 50 degrees Fahrenheit.

74.    Moreover, an AECD "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered *in normal vehicle operation and use*" is a defeat device, unless covered by a limited exception.  40 C.F.R. § 86.1803-01 (emphasis added).  One exception is that a vehicle may use an AECD to reduce the effectiveness of the emissions control system if "the need for the AECD is *justified* in terms of protecting the vehicle against damage . . . ." *Id*. (emphasis added).

75.    However, the EPA has provided guidance that this vehicle damage exception is only to be used to the extent necessary or minimally.   The International Council on Clean Transportation has even specifically noted (albeit

---

[6] When emissions control systems are deactivated (or disengaged), engineers are essentially prioritizing fuel efficiency and power over emissions cleaning, as discussed in ¶ 62, *supra*.

[7] 40 C.F.R. § 86.1803-01 defines an AECD as "any element of design which senses *temperature*, vehicle speed, engine RPM, . . .or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."

in the context of heavy-duty diesel emissions) that an "AECD based solely on ambient temperature might double vehicle emissions, and such an AECD would not be acceptable to EPA in any circumstances."

76.    In fact, the U.S. regulations governing the EPA's investigation of a possible defeat device states that "[t]he manufacturer must show . . . that the vehicle design does not incorporate strategies that *unnecessarily* reduce emission control effectiveness exhibited during the [emissions test procedures] when the vehicle is operated *under conditions which may reasonably be expected to be encountered in normal operation and use*."  40 CFR § 86.1809-01(d) (emphases added).

77.    Similarly, E.U. regulations prohibit the use of devices that limit the effectiveness of the emissions control system except under very limited circumstances, for example when "the need for the device is justified in terms of protecting the engine against damage or accident and for safe operation of the vehicle."  But, under the E.U. regulations, *any device that limits the effectiveness of the emissions control system is defined as a defeat device*.[8]  In other words, whether a device is permissible under limited circumstances, it is nonetheless considered a defeat device.

78.    The spirit of these regulations is clear; they require automakers to "equip vehicles so that the components likely to affect emissions are designed, constructed and assembled so as to enable the vehicle, *in normal use*, to comply" with applicable emissions thresholds.  Regulation (EC) No. 715/2007 Art. 5, par. 1 (emphasis added).

--------

[8] Regulation (EC) No. 715/2007 Art. 3, par. 10 defines a defeat device as "any element of design which *senses temperature*, vehicle speed, engine speed (RPM), . . . or any other parameter for the purpose of activating, modulating, delaying or deactivating the operation of any part of the emission control system, that *reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use* . . . ." (emphasis added)

**D.  Diesel Emissions and Defeat Devices Were Thrust Into the International Spotlight, and Allegations Against Daimler Emerged**

**1.  Volkswagen Was Found to Use Defeat Devices**

79.  As discussed above, the conditions under which emissions testing is performed on new vehicles are highly regulated, and well known to automakers and automotive engineers.  The EPA's September 2015 findings showed how an automaker could use the knowledge of those test conditions to its advantage; they found that the specific defeat device used by VW was a piece of the car's software code which used the position of the car's steering wheel, vehicle speed, duration of operation, and barometric pressure (all of which are standardized in regulatory emissions testing) to detect testing, and activated the emissions controls only when these "testing" conditions were met.

80.  The fallout from this announcement was monumental, with VW later announcing that it anticipated spending more than $7 billion to address the issues stemming from the EPA's findings and notice of violation.  As a result of this shocking news, and because the same report that spurred the EPA's investigation into VW had also noted similar findings for Mercedes vehicles (among others), suspicions spread to other automakers, including Daimler.

81.  Notwithstanding public reports of widespread suspicion that Daimler also was using defeat devices in its vehicles, the Company immediately denied any such allegations, and continued to deny these allegations throughout the remainder of the Class Period.  Moreover, although the Company continued to reiterate that its vehicles complied with all applicable regulations, it mysteriously stopped describing its diesel cars as "clean diesel" or claimed in financial or other statements that they are the "cleanest diesel cars in the world" as it had done in every other previous Class Period annual financial report.

### 2. Despite Evidence that Daimler Knew that Certain BlueTEC Vehicles Were Impermissible, the Company Adamantly Denied the Use of Defeat Devices

82.     Subsequent reports demonstrated otherwise; namely, that Daimler (and Defendants) knew—several months before even the VW notice of violation had been issued by the EPA—that some of its products did not comply with regulations.  Specifically, in June 2015, the Company had recalled around 11,000 of its Sprinter vans (which used the same fundamental BlueTEC emissions control system discussed above) "to change the software of an emissions-related device," and that in letters to the vans' owners, Daimler said the recall was "to avoid possible trouble with authorities and test organizations."

83.     As officers of the Company, the Individual Defendants were charged with responsibility for allocating funds necessary to execute this recall and for approving all vehicle recalls, and therefore knew no later than June 2015 that at least some of its vehicles had emissions control systems that violated governmental emissions regulations (either because they cause impermissible levels of emitted pollutants, or because they were governed by impermissible defeat devices).  The Company had a specific software fix for emissions control issues created, and they proactively sought to install that corrective software to be absolutely certain that they stayed off the radar of emissions regulation authorities.  Given that substantially similar emissions control systems were installed on its BlueTEC passenger diesel vehicles, this was a clear indication (ignored by Defendants) that the Company's entire passenger and light-duty BlueTEC fleet were highly likely to be non-compliant with applicable regulations.

### 3. Daimler Acknowledged that BlueTEC Activated Only at Temperatures Above Fifty Degrees Fahrenheit, but Continued To Deny that Daimler Employed a Defeat Device

84. On February 2, 2016, *Forbes* reported on an article in *Der Spiegel* in which Daimler acknowledged that its BlueTEC systems deactivated at temperatures below 50°F.  Daimler acknowledged this only after a Dutch testing organization found that a Mercedes vehicle with BlueTEC had significantly higher pollutant emissions when tested in cold temperatures.

85. The Company responded that, in its opinion, deactivation of the BlueTEC system was necessary to protect the engine from damage caused by operating in excessively cold temperatures, and therefore was not a defeat device.  But this self-serving explanation ignored, of course, the most problematic element of the Company's excuse:  Daimler's simple software that shut off emissions controls below 50°F ensured that its diesel cars would ***always pass regulatory emissions tests*** because those tests are ***always conducted*** at a temperature well-above that threshold.

86. In the Company's 2015 Annual Report, dated February 16, 2016, Defendants addressed head-on the rumors that Mercedes-Benz diesel passenger and light vehicles produced excessive emissions:

> After reports surfaced o[f] manipulation by a competitor in the fulfillment of emission regulations, doubts began to arise concerning the emission and fuel consumption figures reported by other automakers.  ***Daimler repudiates any allegations of manipulation.***  In particular, ***Daimler does not and has never used any so-called "defeat device"*** that illegally restricts the effectiveness of emission control systems.  This applies to all of our diesel and gasoline engines.

87. Even after the announcement of the EPA investigation noted above in ¶ 11, and the acknowledgement that emissions controls disengaged at ambient temperatures below 50°F, the Company's denials continued.  On April 4, 2016, Defendant Zetsche spoke at Daimler's Annual Shareholders' Meeting, again

1    refuting the mounting allegations against the Company, and explained that
2    deviations can occur between regulatory test results and actual emissions in
3    normal use.  But his comments failed to truly respond to the accusations against
4    the Company; Daimler's particular calibration of its BlueTEC emissions control
5    systems was not a mere difference of typical variation.  Those accusations were
6    based on reports that Mercedes passenger and light-duty diesel vehicles had been
7    specifically programmed to completely deactivate their emissions control systems
8    under on-road, normal use conditions, including below 50°F.

9          88.    On April 21, 2016, Daimler was hit by regulatory bombshells on
10   both sides of the Atlantic.  First, the DOJ asked the Company to instigate an
11   internal investigation in order to review its exhaust emissions process.   And
12   second, KBA (the German Federal Motor Transport Authority) announced that at
13   least two Mercedes diesel cars used defeat devices, and that it concluded that
14   those defeat devices were not necessary to protect the vehicle.

15         89.    The following day, several news outlets reported that Daimler would
16   recall 247,000 diesel cars in Germany to "tweak" those vehicles' emissions
17   control software to address reported excess emissions.  To put the scale of this
18   recall in context, in all of 2015, Daimler sold a total of 798,852 cars in Europe
19   (not just Germany).  This was further evidence that the Company had improperly
20   used defeat devices in its diesel cars and vans.  In light the Company's own
21   disclosures that its emissions control systems were programmed to only be
22   engaged in temperatures above 50°F (and given its June 2015 recall of several
23   thousand diesel Sprinter vans), Daimler recalled the vehicles because (i) the
24   Company's diesel passenger vehicles caused impermissible levels of emitted
25   pollutants, (ii) they were governed by defeat devices, or (iii) both.   The
26   Company's justification that the emissions controls were disengaged to prevent
27   engine damage no longer held.

28

90.   The regulatory scrutiny stemming from these allegations continues to plague the Company.  As of early August 2016, the EPA was still withholding approval for several of Mercedes' 2017 models, although they had approved all of BMW's 2017 turbodiesel models.  Although the EPA would not elaborate on why it had still not approved certifications for the Mercedes diesel vehicles, it told reporters that "discussions continue."

91.   And in September 2016, Kelley Blue Book, a car-oriented website, stated that Daimler was still experiencing delays in regulatory approval and had "recently indicated that both the C300d Sedan, which was originally set to roll out this spring, as well as a new turbodiesel [model] . . . would likely not see showrooms until sometime in mid-2017," and that such a turn of events would likely mean that both cars ended up being sold as 2018 model year vehicles.

E.   **Tests Confirm That Daimler's BlueTEC Vehicles Emit Under Normal Use Significantly Higher Emissions than Permitted Pursuant to U.S. and European Regulations**

92.   In the wake of the announcement of the EPA's notice of violation to VW, a number of governmental and non-governmental organizations began conducting their own independent investigation of vehicles purporting to use diesel emissions control systems in order to comply with emissions requirements. Nearly all of these organizations or government regulators specifically tested Daimler diesel passenger and light-duty vehicles dating back to model year 2010, and found that when tested on the open road (or under conditions other than those standardized test conditions known to all automakers), those Daimler vehicles emitted amounts of NOx well in excess of the levels permitted by applicable U.S. and E.U. regulations.[9]

93.   When these organizations evaluated Daimler vehicles, those "clean diesel" vehicles generally performed well in tests under conditions similar to the

---

[9] These tests were performed by various organizations in the United States and throughout Europe.

regulatory emissions tests, but failed miserably when the test was modified to replicate normal on-road operating conditions to detect defeat devices. In fact, each test that measured Daimler vehicles' NOx emissions on-road under normal use found that the Company's supposedly "clean diesel" vehicles using the BlueTEC exhaust emissions reduction system were emitting NOx emissions many times higher than the levels permitted under applicable regulations.

94. For example, an April 2016 report by the German regulatory authority (which eventually led to the recall of 247,000 Daimler "clean diesel" cars and light-duty vehicles) found that the Mercedes C220 BlueTEC 2.1L; ; Sprinter 2.1L; and V250 BlueTEC 2.1L each exceeded emissions standards when tested outside of the tightly regulated NEDC test conditions.

95. Specifically, the Mercedes C220 BlueTEC 2.1L met the requisite NOx thresholds only when a NEDC test was performed when the car was being started while the engine was still cold (known as a "cold start test"), and emitted more than twice the maximum permissible NOx in on-road testing under normal use conditions. Similarly, the same report found that the V250 BlueTEC's emissions complied with the E.U. standard under NEDC controlled-test conditions, but emitted more than five times the allowable NOx when operated on the open road.

96. The disparity between Daimler's "clean diesel" vehicles emissions on the road and their in-lab performance was also glaring in tests performed by organizations in the Netherlands, the United Kingdom, and France. A Dutch organization known as TNO, for example, released reports concluding that one model C 220 passed traditional emissions tests in controlled environments, but emitted more than eight times the Euro 6 limit when tested on the road under normal conditions. TNO likewise found that Mercedes E 220 CDI and 350 models emitted NOx in excess of Euro 5 and Euro 6 maximums when tested

1  under conditions other than the regulatory test performed for the purposes of

2  seeking a type approval; these would also exceed the regulatory maximums

3  established under Tier 2 for automakers seeking a Certificate of Conformity from

4  the EPA.

5      97.    Other reports from various non-governmental agencies, such as

6  Transport & Environment (a non-governmental organization), came to the same

7  conclusion.   Transport & Environment reported in September 2016 that *five*

8  *Mercedes models* were on its list of the *most polluting* Euro 6 vehicles.  This

9  finding was based on data collected from the EQUA Air Quality Index results of

10  test scores from on-road emissions tests.  These models included the A 180d, A

11  200 d, C 220d, S 350 BlueTEC and V 250.

12      98.    The Mercedes E 250 CDI also was listed on the list for most

13  polluting Euro 5 vehicles.  The report attributed the disparate results to a number

14  of different cheating techniques which, although not specifically identified

15  therein, account for the differing results between controlled laboratory regulatory

16  testing and on-road normal use testing.

17      99.    Indeed, by the time this Transport & Environment report was issued,

18  the Company had already acknowledged that its emissions control systems

19  incorporated a defeat device, as that term is defined pursuant to E.U. regulations,

20  which only permitted its passenger diesel and light-duty vehicles' emissions

21  control systems to fully engage when the ambient temperature moved above 50°F.

22  Although the Company did not disclose any other conditions under which its

23  diesel emissions control systems were restricted, it is apparent from the reports

24  referenced above, and other discussing similar findings, that Daimler manipulated

25  its diesel emissions control systems to meet regulatory testing thresholds,

26  particularly for NOx emissions, and that elements other than just temperature are

27  likely at play in the applicable defeat devices.

28

V.   **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT**

A.   **Pre-September 2015 Misleading Statements and Omissions**

1.   **2011 Annual Report Misleading Statements and Omissions**

100.   The Class Period begins on February 22, 2012, when the Company released its financial results for fiscal year 2011 (the "2011 Annual Report"), which was signed by each of the Individual Defendants.

101.   With respect to the Company's diesel, the 2011 Annual Report stated: "We are global leaders for diesel engines with our BLUETEC technology. *Our BLUETEC automobiles fulfill the strictest emission standards and are the cleanest diesel cars in the world*."   Defendants also stated therein that the Company "continue[d] to develop our vehicles with state-of-the-art internal-combustion engines and *are optimizing them to achieve significantly lower . . . emissions*."

102.   The statement set forth in ¶ 101 above was materially false and misleading when made.  Far from being the "cleanest diesel cars in the world," Defendants knew or were deliberately reckless in not knowing that the Company's diesel cars and light-duty vehicles emitted significantly higher quantities of pollutants (including but not limited to NOx) under normal operation than Defendants disclosed in their publicly announced emissions testing results, and that these excessive emissions were caused by BlueTEC's emissions control system's software that intentionally shut-down that emissions control system under certain conditions unnecessary to protect the engine from damage, including but not limited to when the ambient temperature dropped below 50°F.

103.   Further, the statement set forth in ¶ 101 above misleadingly omitted to state material information when made.  Specifically, in connection with the statements alleged to have been false and misleading above, Defendants omitted to state that the ability of its passenger and light-duty diesel vehicles to "fulfill the

strictest emission standards" was critically dependent on the BlueTEC emissions control system's engagement in test conditions at temperatures higher than 50°F (approximately 50 °F), and that such systems were intentionally designed to shut down under certain conditions unnecessary to protect the engine from damage. Likewise, Defendants omitted to state that, to the extent the Company had previously developed, and continued to develop, "and further optimize [their] vehicles with state-of-the-art internal-combustion engines" that were optimized "to achieve significantly lower . . . emissions," that development was limited to the optimization of such engines to meet specific emissions testing requirements, rather than to actually cause the Company's clean diesel passenger vehicles to significantly reduce emissions under normal use.

### 2. 2012 Annual Report Misleading Statements and Omissions

104. On February 21, 2013, the Company released its financial results for fiscal year 2012 (the "2012 Annual Report"), which was signed by each of the Individual Defendants.

105. With respect to the Company's diesel offerings, the 2012 Annual Report stated: "We are global leaders for diesel engines with our BLUETEC technology. ***Our BLUETEC automobiles fulfill the strictest emission standards and are the cleanest diesel cars in the world***." Defendants also stated therein that the Company "continue[d] to develop and further optimize our vehicles with state-of-the-art combustion engines ***in order to achieve significantly lower . . . emissions***."

106. The statement set forth in ¶ 105 above was materially false and misleading when made. Far from being the "cleanest diesel cars in the world," Defendants knew or were deliberately reckless in not knowing that the Company's diesel cars and light-duty vehicles emitted significantly higher quantities of pollutants (including but not limited to NOx) under normal operation

1    than Defendants disclosed in their publicly announced emissions testing results,

2    and that these excessive emissions were caused by BlueTEC's emission control

3    system's software that intentionally shut down that emissions control system

4    under certain conditions unnecessary to protect the engine from damage,

5    including but not limited to when the ambient temperature dropped below 50°F.

6        107.   Further, the statement set forth in ¶ 105 above misleadingly omitted

7    to state material information when made.   Specifically, in connection with the

8    statements alleged to have been false and misleading above, Defendants omitted

9    to state that the ability of its passenger and light-duty diesel vehicles to "fulfill the

10   strictest emission standards" was critically dependent on the BlueTEC emissions

11   control system's engagement in test conditions at temperatures higher than 50°F

12   (approximately 50 °F), and that such systems were intentionally designed to shut

13   down under certain conditions unnecessary to protect the engine from damage.

14   Likewise, Defendants omitted to state that, to the extent the Company had

15   previously developed, and continued to develop, "state-of-the-art combustion

16   engines" that were optimized "to achieve significantly lower . . . emissions," that

17   development was limited to the optimization of such engines to meet specific

18   emissions testing requirements, rather than to actually cause the Company's clean

19   diesel passenger vehicles to significantly reduce emissions under normal use.

20             **3.        September 11, 2013 Misleading Statements and Omissions**

21       108.   On September 11, 2013, MBUSA announced in a press release titled

22   "2014 E250 BlueTEC Sedan Gets 45 MPG EPA Highway Rating," the

23   introduction of its 2014 model year E250 BlueTEC model.   In this press release,

24   MBUSA stated: "To ensure the E250 BlueTEC meets exhaust emission

25   regulations in all 50 U.S. states, the BlueTEC system uses AdBlue injection to

26   *make the diesel as clean as a state-of-the-art gasoline engine*."

27

28

109.  The statement set forth in ¶ 108 above, was materially false and misleading when made.  Rather than "meet[ing] exhaust emission regulations in all 50 U.S. states," based on a system "mak[ing] the diesel [E250 BlueTEC] as clean as a state-of-the-art gasoline engine," Defendants knew or were deliberately reckless in not knowing that the E250 BlueTEC (as well as other 2014 model year BlueTEC vehicles using substantially the same "clean diesel" technology) was ***not*** "as clean as state-of-the-art gasoline engines," and that, given the BlueTEC's emissions control system's software that intentionally shut down that emissions control system under certain conditions unnecessary to protect the engine from damage, including but not limited to when the ambient temperature dropped below 50°F, the E250 BlueTEC's emissions did ***not*** meet exhaust regulations in all 50 U.S. states.

110.  Further, the statement set forth in ¶ 108 above misleadingly omitted to state material information when made.  Specifically, in connection with the statements alleged to have been false and misleading, Defendants misleadingly omitted to state that the BlueTEC clean diesel system was designed by Daimler engineers to disengage under certain conditions, including but not limited to when the ambient temperature dropped below 50°F, rendering the vehicles' diesel emissions controls ineffective and causing such vehicles under normal operating conditions to emit several times the emissions per vehicle than permitted under applicable EPA, Euro 5, and/or Euro 6 regulatory requirements.

**4.     2013 Annual Report Misleading Statements and Omissions**

111.  On February 18, 2014, the Company released its 2013 Annual Report," which was signed by the Individual Defendants.

112.  With respect to the Company's diesel offerings, the 2013 Annual Report stated:  "Thanks to BLUETEC technology, we are a world leader for diesel vehicles. ***Automobiles equipped with this technology conform to the***

1    *strictest emissions standards and are the cleanest diesel cars in the world*."
2    Defendants also stated therein that the Company "continue[d] to enhance our
3    vehicles with state-of-the-art internal-combustion engines that *we are optimizing*
4    *to achieve significantly lower . . . emissions*."

5        113.   The statement set forth in ¶ 112 above was materially false and
6    misleading when made.  Far from being the "cleanest diesel cars in the world,"
7    Defendants knew or were deliberately reckless in not knowing that the
8    Company's diesel cars and light-duty vehicles emitted significantly higher
9    quantities of pollutants (including but not limited to NOx) under normal operation
10   than Defendants disclosed in their publicly announced emissions testing results,
11   and that these excessive emissions were caused by BlueTEC's emissions control
12   system's software that intentionally shut down that emissions control system
13   under certain conditions unnecessary to protect the engine from damage,
14   including but not limited to when the ambient temperature dropped below 50°F.

15       114.   Further the statement set forth in ¶ 112 above misleadingly omitted
16   to state material information when made.  Specifically, in connection with the
17   statements alleged to have been false and misleading above, Defendants omitted
18   to state that the ability of its passenger and light-duty diesel vehicles to "conform
19   to the strictest emissions standards" was critically dependent on the BlueTEC
20   emissions control system's engagement in test conditions at temperatures higher
21   than 50°F, and that such systems were designed to intentionally designed to shut
22   down under certain conditions unnecessary to protect the engine from damage.
23   Likewise, Defendants omitted to state that, to the extent the Company had
24   previously developed, and continued to develop, "state-of-the-art internal-
25   combustion engines" that were optimized "to achieve significantly lower . . .
26   emissions," that development was limited to the optimization of such engines to
27   meet specific emissions testing requirements, rather than to actually cause the

28

Company's clean diesel passenger vehicles to significantly reduce emissions under normal use.

### 5.   2014 Annual Report Misleading Statements and Omissions

115.   On February 13, 2015, the Company released its financial results for fiscal year 2014 (the "2014 Annual Report"), which was signed by the Individual Defendants.

116.   With respect to the Company's diesel offerings, the 2014 Annual Report stated: "Thanks to BLUETEC technology, we are a world leader for diesel vehicles. ***Automobiles equipped with this technology conform to the strictest emissions standards and are the cleanest diesel cars in the world***."  Defendants also stated therein that the Company "continue[d] to enhance our vehicles with state-of-the-art internal combustion engines that ***we are optimizing to achieve significantly lower . . . emissions***."

117.   The statement set forth in ¶ 116 above was materially false and misleading when made.  Far from being the "cleanest diesel cars in the world," Defendants knew or were deliberately reckless in not knowing that the Company's diesel cars and light-duty vehicles emitted significantly higher quantities of pollutants (including but not limited to NOx) under normal operation than Defendants disclosed in their publicly announced emissions testing results, and that these excessive emissions were caused by BlueTEC's emissions control system's software that intentionally shut-down that emissions control system under certain conditions unnecessary to protect the engine from damage, including but not limited to when the ambient temperature dropped below 50°F.

118.   Further the statement set forth in ¶ 116 above misleadingly omitted to state material information when made.  Specifically, in connection with the statements alleged to have been false and misleading above, Defendants omitted to state that the ability of its passenger and light-duty diesel vehicles to "conform

to the strictest emissions standards" was critically dependent on the BlueTEC emissions control system's engagement in test conditions at temperatures higher than approximately 50°F, and that such systems were intentionally designed to shut down under certain conditions unnecessary to protect the engine from damage.  Likewise, Defendants omitted to state that, to the extent the Company had previously developed, and continued to develop, "state-of-the-art combustion engines" that were optimized "to achieve significantly lower . . . emissions," that development was limited to the optimization of such engines to meet specific emissions testing requirements, rather than to actually cause the Company's "clean diesel" passenger vehicles to significantly reduce emissions under normal use.

### B.   Post-Defeat Device Allegations Misleading Statements and Omissions

#### 1.   September 2015 Misleading Statements and Omissions

119.   As set forth above, in September 2015, news was widespread concerning the revelation that VW had used an illegitimate defeat device to comply with applicable emissions requirements in the U.S. and the E.U.   In response to the VW news, as well as rumors from multiple sources that Daimler also employed similar technology to skirt emissions regulations in on-road normal use driving conditions, Daimler began issuing a series of emphatic denials, claiming that the issues plaguing VW were not present in Mercedes-Benz vehicles.

120.   Specifically, in a Company statement to *Reuters* on September 21, 2015, Daimler said that it had heard about the VW accusations and stated that the "issue described by the press does not apply to Mercedes-Benz Cars."

121.   Just a few days later, Daimler continued to deny the existence of any problems with its emissions control systems.   In a September 25, 2015 press release, the Company stated emphatically:   "We categorically deny the accusation

1   of manipulating emission tests regarding our vehicles. ***A defeat device***, a function

2   which illegitimately reduces emissions during testing, ***has never been and will***

3   ***never be used at Daimler***.  This holds true for both diesel and petrol engines."

4        122.   The statements set forth in ¶¶ 120-121 above were materially false

5   and misleading and omitted to state material information when made.   As

6   Defendants knew at the time, and as would be subsequently disclosed, Daimler

7   did actually use a defeat device (as that term is defined under applicable

8   regulations) in its diesel passenger and light-duty vehicles, including but not

9   limited to the Affected Models, and the Company intentionally calibrated its

10  emissions control system for such vehicles to shut down under certain conditions,

11  including whenever the ambient temperature was below 50°F, a threshold

12  unnecessary to protect the vehicle against damage under normal use.  While such

13  calibration may not have been explicitly intended to identify when Daimler

14  vehicles were being subject to emissions testing (the specific manipulation

15  alleged with respect to VW), the intentional calibration of Daimler diesel

16  emissions control systems to shut down at ambient temperatures below 50°F

17  meant that the emissions control systems were designed so that they would be

18  operational under testing conditions, but would be rendered non-operational (by

19  software design) for significant periods of time under on-road normal vehicle use.

20       123.   Further the statements set forth in ¶¶ 120-121 above, were materially

21  false and misleading when made because Defendants knew that the Company's

22  diesel cars and light-duty vehicles emitted significantly higher quantities of

23  pollutants (including but not limited to NOx) under normal operation than

24  Defendants disclosed in their publicly announced emissions testing results, and

25  that these excessive emissions were caused by BlueTEC's emissions control

26  system's software that intentionally shut down that emissions control system

27

28

under certain conditions unnecessary to protect the engine from damage, including but not limited to when the ambient temperature dropped below 50°F.

### 2.   Q3 2015 Earnings Call Misleading Statements and Omissions

124.   On October 22, 2015, Daimler held a conference call (the "3Q 2015 Call") to discuss the Company's financial results for the third quarter of its 2015 fiscal year.

125.   During the 3Q 2015 Call, Bodo Uebber, Daimler CFO, spontaneously issued another denial on the Company's behalf, stating: "In light of the recent news, I would like to say a few words about our diesel technology. *Daimler does not use and never has used defeat devices*, which illegally limit the effectiveness of the emission control system.  *This applies to all of our diesel . . . engines worldwide*."

126.   The statement set forth in ¶ 125 above was materially false and misleading and omitted to state material information when made.  As Defendants knew at the time, and as would be subsequently disclosed, Daimler did actually use a defeat device (as that term is defined under applicable regulations) in its diesel passenger and light-duty vehicles, including but not limited to the Affected Models, and the Company intentionally calibrated its emissions control systems for such vehicles to shut down under certain conditions unnecessary to protect the vehicle against damage under normal use, including whenever the ambient temperature was below 50°F.   While such calibration may not have been explicitly intended to identify when Daimler vehicles were being subject to emissions testing (the specific manipulation alleged with respect to VW), the intentional calibration of Daimler diesel emissions control systems to shut down at ambient temperatures below 50°F meant that the emissions control systems were designed so that they would be operational under testing conditions, but

would be rendered non-operational (by software design) for significant periods of time under on-road normal vehicle use.

### 3. January 2016 Press Release Misleading Statements and Omissions

127. On January 29, 2016, the Company issued a press release, again denying the continued rumors that, as a result of manipulation and/or a defeat device, Mercedes-Benz cars and light-duty vehicles (including the Affected Models) emitted more NOx than permitted under applicable government regulations:

> We absolutely *reject speculation or interpretation that possible deviations between test-bench measurements and measurements made during real driving conditions can only be explained by manipulation. No defeat device, i.e. a function that improperly restricts the effectiveness of exhaust-gas aftertreatment, is used by Mercedes-Benz*.

128. This statement (and the press release generally) had been reviewed and approved by employees and officers within Daimler capable of binding the Company, and who, either knew, or were deliberately reckless in not knowing that the statement was false and misleading.

129. The statement set forth in ¶ 127 above was materially false and misleading, and omitted to state material information when made. As Defendants knew at the time, and would be subsequently disclosed, Daimler did actually use a defeat device (as that term is defined under applicable regulations) in its diesel passenger and light-duty vehicles, including but not limited to the Affected Models, and the Company intentionally calibrated its emissions control systems for such vehicles to shut-down under certain conditions unnecessary to protect the vehicle from damage under normal use, including whenever the ambient temperature was below 50°F. While such calibration may not have been explicitly intended to identify when Daimler vehicles were being subject to emissions testing (the specific manipulation alleged with respect to VW), the

intentional calibration of Daimler diesel emissions control systems to shut down at ambient temperatures below 50°F meant that the emissions control systems were designed so that they would be operational under testing conditions, but would be rendered non-operational (by software design) for significant periods of time under on-road normal vehicle use.

### 4. February 2016 Misleading Statement and Omission

130. On February 2, 2016, *Forbes* published an article entitled "Dieselgate Reaches Daimler: A Defeat Device By Another Name" reporting details of the accusations against the Company. In the article, the Company states that "***A defeat device***, i.e. a function that limits the efficacy of the emissions treatment in an inadmissible way, ***is not being used by Mercedes-Benz. Furthermore, Mercedes-Benz vehicles do not have a function that automatically registers that the vehicle is in a testing bay***."

131. This statement (and the press release generally) had been reviewed and approved by employees and officers within Daimler capable of binding the Company, and who, either knew, or were deliberate reckless in not knowing that the statement was false and misleading.

132. The statement set forth in ¶ 130 above was materially false and misleading, and omitted to state material information when made. As Defendants knew at the time, and would be subsequently disclosed, Daimler did actually use a defeat device (as that term is defined under applicable regulations) in its diesel passenger and light-duty vehicles, including but not limited to the Affected Models, and the Company intentionally calibrated its emissions control systems for such vehicles to shut down under certain conditions unnecessary to protect the vehicle from damage under normal use, including whenever the ambient temperature was below 50°F. While such calibration may not have been explicitly intended to identify when Daimler vehicles were being subject to

emissions testing (the specific manipulation alleged with respect to VW), the intentional calibration of Daimler diesel emissions control systems to shut down at ambient temperatures below 50°F meant that the emissions control systems were designed so that they would be operational under testing conditions, but would be rendered non-operational (by software design) for significant periods of time under on-road normal vehicle use.

### 5.    2016 Annual Shareholder Meeting Misleading Statements and Omissions

133.   On April 6, 2016, Daimler held its Annual Shareholders' Meeting to discuss the Company's financial results and overall performance.

134.   During the meeting, Defendant Zetsche refuted the mounting allegations against the Company: "The technology that has generated the most headlines in recent months is that of diesel drive systems.  Daimler did not cause these headlines.  Nonetheless, a side effect of this development is that allegations were also made against our products.  ***We categorically reject those allegations***."

135.   The statement set forth in ¶ 134 above was materially false and misleading and omitted to state material information when made.  As Defendants knew at the time, and would be subsequently disclosed, Daimler did actually use a defeat device (as that term is defined under applicable regulations) in its diesel passenger and light-duty vehicles, including but not limited to the Affected Models, and the Company intentionally calibrated its emissions control systems for such vehicles to shut down under certain conditions unnecessary to protect the vehicle from damage under normal use, including whenever the ambient temperature was below 50°F.

### 6.    2015 Annual Report Misleading Statements and Omissions

136.   On February 16, 2016, the Company released its financial results for fiscal year 2015 (the "2015 Annual Report"), which was signed by the Individual Defendants.

137.   With respect to the Company's diesel passenger and light-duty vehicle offerings, the 2015 Annual Report stated: "We continue to enhance our vehicles with state-of-the-art internal combustion engines that we are *optimizing to achieve significantly lower . . . emissions*."  Defendants also stated therein that "the cars with [BlueTEC] already *comply with the strictest emission standards*."

138.   The statement set forth in ¶ 137 above misleadingly omitted to state material information when made.  Specifically, in connection with the statements alleged to have been false and misleading above, Defendants omitted to state that the ability of its passenger and light-duty vehicles to "comply with the strictest emission standards"[10] was critically dependent on the BlueTEC emissions control system's engagement in test conditions at temperatures higher than 50°F, and that such systems were intentionally designed to shut-down under certain conditions unnecessary to protect the engine from damage.  Likewise, Defendants omitted to state that, to the extent the Company had previously developed, and continued to develop "state-of-the-art internal combustion engines" that were optimized "to achieve significantly lower . . . emissions," that development was limited to the optimization of such engines to meet specific emissions testing requirements, rather than to actually cause the Company's "clean diesel" vehicles to significantly reduce emissions under normal use.

139.   The Company also stated in the 2015 Annual Report:

> After reports surfaced o[f] manipulation by a competitor in the fulfillment of emission regulations, doubts began to arise concerning the emission and fuel consumption figures reported by other automakers.  *Daimler repudiates any allegations of manipulation*.  In particular, *Daimler does not use and has never used any so-called "defeat device" that illegally restricts the effectiveness of emission control systems*.  This applies to all of our diesel and gasoline engines.

---

[10]  Notably, whereas previous Company annual reports stated that BlueTEC automobiles conformed with the strictest emissions standards and were "the cleanest diesel cars in the world," after the VW scandal and rumors surrounding Mercedes, the Company no longer claimed in its 2015 Annual Report that it made "the cleanest diesel cars in the world.

140.   The statement set forth in ¶ 139 above was materially false and misleading and omitted to state material information when made.  As Defendants knew at the time, and would be subsequently disclosed, Daimler did actually use a defeat device (as that term is defined under applicable regulations) in its diesel passenger and light-duty vehicles, including but not limited to the Affected Models, and the Company intentionally calibrated its emissions control systems for such vehicles to shut down under certain conditions unnecessary to protect the vehicle from damage under normal use, including whenever the ambient temperature was below 50°F.

## VI.   THE TRUTH EMERGES

141.   The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized after the markets closed on September 21, 2015, when Transport & Environment[11] published an article entitled "VW's cheating is just the tip of the iceberg."  The article used emissions data from testing authorities throughout Europe to observe that diesel vehicles, including Mercedes-Benz vehicles, were polluting at significantly higher levels than previously believed.  Diesel vehicles were emitting noxious pollutants during normal use and operation at levels that were many multiples of the relevant emissions standards.

142.   Most saliently, the article found that "[f]or new diesel cars nitrogen oxide *[NOx] emissions are typically five times higher on the road than the allowed limit and just one in 10 cars meets the required level on the road* . . . ."  Additionally, the article revealed that "[i]n CO2 tests, on average almost every

---

[11] The European Federation for Transport and Environment ("Transport & Environment") is a non-governmental organization comprised of 42 member organizations across 27 countries.  Transport & Environment is recognized as a non-governmental organization in Special Consultative Status with the Economic and Social Council of the United Nations.

Mercedes model achieves levels on the road over 50% higher than the laboratory tests."

143.   The Transport & Environment article revealed that, despite Daimler's vehement protestations to the contrary and Defendant Uebber's claim that "Daimler does not use and has never used defeat devices," Mercedes' BlueTEC diesel vehicles emit significantly higher levels of pollutants during normal use and operation compared to conditions that mimic the highly-regulated test conditions.  *See* ¶¶ 6-10, 89, 92-99, *supra*.   Transport & Environment concluded that the results observed were highly indicative that manufacturers, including Defendants, were using defeat devices.

144.   In response to this partial disclosure, on September 22, 2015 the prices of the Daimler ADRs fell approximately 7% on heavy trading volume. Shares of DDAIF fell $5.38 per share to close at $74.30; and DDAIY fell $5.44 per share to close at $74.01.

145.   While this partial disclosure of adverse news removed some of the artificial inflation in the Daimler ADRs, the prices of the ADRs remained artificially inflated due to Defendants' vehement protestations that Mercedes diesel passenger vehicles and light-duty vehicles did not utilize a defeat device, and their continued false statements relating to the allegations.

146.   The relevant truth and/or foreseeable risks concealed by Defendants' misconduct was further disclosed and/or materialized during the day, and after the close of trading on April 21, 2016.

147.   On April 21, 2016, after the market closed, the Company disclosed that the U.S. Department of Justice (the "DOJ") had requested that Daimler conduct an internal investigation to "review its certification and admissions process related to exhaust emissions in the United States."  With little option, Daimler initiated an internal investigation.

148.   Numerous analysts highlighted Daimler's disclosure of the DOJ mandated internal investigation into its emissions certification and regulatory compliance process.  For example, Morningstar noted that the Company's "stock opened lower on April 22 because of a separate announcement that the U.S. [DOJ] requested an internal investigation into the company's exhaust emissions certification process.  Last year, the company announced to the market that there are no so-called defeat devices in its vehicles."

149.   Other analysts reacted similarly, concluding that the drop in the prices of Daimler securities (including the ADRs) were directly attributable to the announcement of the internal investigation:  Natixis' report on the Company's Q1 2016 earnings conference call stated that, "[t]he market nevertheless punished the stock severely (-6.6%), reflecting investors' concerns about the [DOJ]'s investigation into the group's emissions in the USA"; Morgan Stanley concluded that "[t]he internal review of US emissions procedures, at the DOJ's request, overshadows Q116 performance"; and Barclays' opined that the governmental investigation was "likely to be a stock overhang until further visibility is provided."

150.   In addition to the disclosure that Daimler would have to conduct an internal investigation at the DOJ's request, the KBA, the German Federal Motor Transport Authority, released a report on April 21, 2016 specifically identifying at least two Mercedes diesel passenger vehicles that it believed improperly "adjust the efficiency of their emission control system to driving conditions and environmental conditions.  ***This corresponds to a defeat device*** according to the definition set forth in Article 3 of the Regulation (EC) No. 715/2007."

151.   For example, the KBA found that the Mercedes V250 BlueTEC 2.1L, emissions performance during "[t]he [New European Driving Cycle] 10°C test yields ***2.6 times the NOx threshold*** value.   The [portable emissions

measurement system] on-the-road measurements ***produce 5-6 times the NOx threshold*** value for the [New European Driving Cycle] test cycles. . . The NOx value of the [Real Driving Emissions] test ***exceeds the threshold value fourfold***."

152. In the discussion of the Mercedes V 250 BlueTEC 2.1L the KBA noted that based on its conversations with Daimler about Mercedes' emissions:

> [t]he manufacturer agrees to introduce an extended temperature range into the current production in the summer of 2016 by way of a set of measures. This [implementation of an extended temperature range for the emissions control system] will also be available to all the vehicles in the field as part of a service campaign. If the manufacturer assumes these measures as planned and if the KBA verifies their effectiveness, then doubts as to the lawfulness of the defeat device for reasons of engine protection would cease to exist.

153. In sum, the KBA had "doubts as to the lawfulness of the [temperature range-based] defeat device" employed by Mercedes; these findings led to a recall of 247,000 vehicles in the field, so that the Company could implement an "extended temperature range." *Reuters* and other news outlets published articles before the market opened on April 22, 2016, highlighting the fact that several German automakers, including Mercedes, were recalling vehicles to "fix emissions" by "tweak[ing] diesel engine software [] blamed for causing high pollution." *Financial Times* cited a Company spokesperson who said that Daimler would be recalling 247,000 vehicles.

154. Much like the announcement of the DOJ-requested internal investigation, market analysts noted the effect of the KBA report and the recall on the price of Daimler securities. Societe Generale noted the confluence of these negative events for the Company, stating that "[e]xpectations for Q1 were sufficiently modest, and so the actual results and outlook might well have been better received, but for the twin shadows cast by Daimler's admission on the eve of the release that the US [DOJ] had asked it to review its exhaust emissions certification processes and the news the next day that a number of automakers

including Mercedes had agreed to recall 630,000 vehicles in Germany," including 247,000 by Daimler alone.

155.   After the markets closed on April 21, 2016, these disclosures of the truth and/or materialization of foreseeable risks which were concealed by Defendants' false and misleading statements and omissions caused the prices of the Daimler ADRs to fall approximately 5% on April 21 and 22, 2016.  Shares of DDAIF fell $3.79 per share over those two trading days to close at $70.85 per share on April 22, 2016; shares of DDAIY fell $3.94 per share over those two trading days to close at $70.76 per share on April 22, 2016, thereby fully removing the artificial inflation in the Daimler ADRs.

## VII.   THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

156.   The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

157.   None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

158.   To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ

materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

159.  Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of Daimler who knew that the forward-looking statement was false.

## VIII.  LOSS CAUSATION

160.  As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, as alleged above in ¶¶ 101, 105, 108, 112, 116, 120-121, 125, 128, 130, 134, 137, 139, Daimler's publicly-traded ADRs traded at artificially inflated prices during the Class Period.  Specifically, Defendants' misrepresentations and omissions regarding (1) the true capabilities of its BlueTEC diesel engines to produce "clean diesel" emissions and (2) the Company's use of a defeat device to comply with emissions testing caused and/or maintained the artificial inflation in Daimler's ADR price during the Class Period.  Relying on the integrity of the market price for Daimler ADRs and public information relating to Daimler and Mercedes-Benz, Lead Plaintiff and other Class members purchased or otherwise acquired Daimler ADRs at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein.  As a result of their purchases of Daimler ADRs during the Class Period at artificially inflated prices and the removal of that inflation upon the partial disclosures set forth

1  below, Lead Plaintiff and the Class suffered economic losses, *i.e.*, damages under
2  the federal securities laws.

3      161.   Defendants' false and misleading statements, material omissions and
4  course of conduct had their intended effect, directly and proximately causing
5  Daimler ADRs to trade at artificially inflated prices during the Class Period.
6  Specifically, DDAIF traded as high as $100.32 per ADR share on May 21, 2015;
7  and DDAIY traded as high as $100.31 per ADR share on May 21, 2015.   All
8  misrepresentations and omissions of material fact which were not immediately
9  followed by an upward movement in the price of Daimler ADRs served to
10  maintain the artificially inflated price of Daimler ADRs.

11      162.   Had Defendants been truthful about these matters during the Class
12  Period, Lead Plaintiff and other members of the Class would not have purchased
13  or otherwise acquired their Daimler ADRs at the artificially inflated prices at
14  which they traded.   It was entirely foreseeable to the Defendants that
15  misrepresenting and concealing these material facts from the public would
16  artificially inflate the price of, or artificially maintain an elevated price for,
17  Daimler ADRs.

18      163.   The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and
19  other members of the Class were a direct, proximate, and foreseeable result of
20  Defendants' materially false and misleading statements and omissions of material
21  fact, which artificially inflated the price of Daimler ADRs, and the subsequent
22  significant decline in the value of the Company's ADRs when the relevant truth
23  was revealed and/or the risks previously concealed by Defendants' material
24  misrepresentations and omissions materialized.

25      164.   Defendants' false and misleading statements and omissions about (1)
26  the true capabilities of its BlueTEC diesel engines to produce "clean diesel"
27  emissions and (2) the Company's use of a defeat device to comply with emissions

28

1    testing, caused and/or maintained the artificial inflation in Daimler ADRs
2    throughout the Class Period until the relevant truth concealed and/or obscured by
3    Defendants' misconduct were revealed to the market.  These revelations occurred
4    through at least two partial corrective disclosures, on September 21, 2015 and
5    April 21, 2016, as detailed in ¶¶ 165-170, *infra*.  The timing and magnitude of the
6    declines in the price of Daimler ADRs, as detailed herein, negate any inference
7    that the losses suffered by Lead Plaintiff and members of the Class were caused
8    by changed market factors or other macroeconomic factors unrelated to
9    Defendants' fraudulent conduct.

10        165.   The disclosure that Daimler light-duty and passenger diesel vehicles
11   actually emitted, under real-world conditions, significantly more pollutants than
12   disclosed by the Company's announced testing results was a foreseeable
13   consequence of, and within the zone of risk concealed by, the Defendants'
14   misrepresentations and omissions concerning the true scope and adequacy of
15   emissions controls present and operative in the Affected Models, and whether
16   those Affected Models complied with EPA and European emissions standards.
17   Moreover, the September 21, 2015 disclosure revealed new information that was
18   previously concealed and/or obscured by the Defendants' misstatements,
19   omissions and fraudulent course of conduct.  These disclosures partially (but
20   incompletely) revealed some of the relevant truth concealed and/or obscured by
21   Defendants' prior misstatements and omissions surrounding emissions controls
22   applied to the Company's diesel cars and vans.

23        166.   As a direct and proximate result of this partial disclosure and/or
24   materialization of foreseeable risks concealed by the Defendants' fraud, shares of
25   the Daimler ADRs dropped approximately 7% on heavy trading; shares of
26   DDAIF fell $5.38 per share from its previous closing price to close at $74.30 per
27   share on September 22, 2015, while shares of DDAIY fell $5.44 per share from

28

its previous closing price to close at $74.01 per share on September 22, 2015, thereby partially removing the artificial inflation in Daimler ADRs.

167.   On April 21, 2016, Daimler issued a press release entitled "Daimler conducts internal investigation regarding its certification process related to exhaust emissions in the United States," announcing that the Company was investigating "possible indications of irregularities" at the request of the U.S. Department of Justice (the "DOJ"), stating in part:

> Daimler AG conducts an internal investigation regarding its certification process related to exhaust emissions in the United States upon the request of the [DOJ]. Daimler is cooperating fully with the authorities.   Daimler will consequently investigate possible indications of irregularities and of course take all necessary actions.
>
> The company's experience with the U.S. authorities has clearly shown that a conservative communication supports the constructive dialogue with the authorities.

168.   The Company stated in a press release the following day:

> U.S. [DOJ] requests internal investigation.  The U.S. [DOJ] has requested from Daimler AG on April 15, 2016, by pointing out the strict confidentiality of the matter, to review its certification and admissions process related to exhaust emissions in the United States by way of an internal investigation in cooperation with the DOJ.  Daimler has agreed to cooperate fully with the DOJ.

169.   In addition to the announcement of the DOJ's investigation, the Company received even more bad news on April 21, 2016, when the KBA, the German Federal Motor Transport Authority, released a report announcing the results of emissions testing on 53 different vehicle models.  The report concluded that at least two Mercedes-Benz BlueTEC vehicles "adjust the efficiency of their emission control system to driving conditions and environmental conditions. *This corresponds to a defeat device* according to the definition set forth in Article 3 of the Regulation (EC) No. 715/2007."   Although several manufacturers claimed that the measures were intended to protect the engine or otherwise ensure safe operations, the report concluded further that for at least these two Mercedes

1  models, "*the Commission of Inquiry of the BVMI has doubts regarding the*
2  *lawfulness of the defeat device used*."

3      170.   *Reuters* announced before the market opened the following day that
4  "German automakers to recall 630,000 cars to fix emissions."  This included
5  630,000 vehicles from manufacturers including Porsche, VW, Opel, Audi, and
6  Mercedes-Benz, recalled to "tweak diesel engine software [] blamed for causing
7  high pollution."  The *Financial Times* quoted a Company spokesperson who said
8  that Daimler and Mercedes-Benz would be recalling 247,000 vehicles.

9      171.   As a direct and proximate result of these final corrective disclosures
10  and/or materializations of foreseeable risks concealed by Defendants' fraud, the
11  prices of Daimler ADRs dropped approximately 5% on April 21 and 22, 2016.
12  Shares of DDAIF fell $3.79 per share over those two trading days to close at
13  $70.85 per share on April 22, 2016; shares of DDAIY fell $3.94 per share over
14  those two trading days to close at $70.76 per share on April 22, 2016, thereby
15  fully removing the artificial inflation in the Daimler ADRs.

16  **IX.   CONTROL PERSON ALLEGATIONS**

17      172.   By virtue of the Individual Defendants' positions of management
18  and control within the Company, they had access to undisclosed adverse
19  information about Daimler's operations and performance, including (1) the true
20  capabilities of its BlueTEC diesel engines to produce "clean diesel" emissions
21  and (2) the Company's use of a defeat device to comply with emissions testing, as
22  particularized herein.  The Individual Defendants ascertained such information
23  through Daimler's internal corporate documents, and connections with each other
24  and with corporate officers and employees, attendance at Board of Management
25  meetings, including committees thereof, and through reports and other
26  information provided to them in connection with their roles and duties as Daimler
27  officers, members of the Board of Management, and as managers.

28

173.   The Individual Defendants participated in the drafting, preparation and/or approval of the various public investor reports and other communications complained of herein, and knew or with deliberate recklessness disregarded that there were material misstatements and omissions contained therein.  Because of their Board or executive or managerial positions with Daimler, each of the Individual Defendants had access to the adverse undisclosed information about Daimler's operations and performance, including information about (1) the true capabilities of its BlueTEC diesel engines to produce "clean diesel" emissions and (2) the Company's use of a defeat device to comply with emissions testing as particularized herein, and knew (or were deliberately reckless in not knowing) that these adverse events rendered the positive representations made by or about Daimler and its business, or adopted by the Company, materially false and misleading.

174.   The Individual Defendants, because of their positions of control and authority as officers of the Company or members of Daimler's Board of Management, were able to and did control the content of various financial statements, press releases, and other public statements made by or pertaining to the Company during the Class period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations therein.

175.   As officers, members of the Board of Management, and controlling persons of a publicly held company whose ADRs are governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the

Company's operations and performance, including information regarding (1) the Company's diesel cars and vans' use a defeat device; and (2) that such cars and vans' emitted many multiples of the maximum regulatory limits for emissions of exhaust pollutants such as NOx, as particularized herein, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded ADRs would be based on truthful and accurate information.   The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## X.      CLASS ACTION ALLEGATIONS

176.   Lead Plaintiff brings this action on behalf of itself and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired Daimler ADRs and were damaged thereby.   Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, member of the Board of Management, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

177.  The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of the proposed Class.  At the end of the Class Period, Daimler ADRs were held by thousands of persons, and actively traded on over-the-counter

1    markets.  The disposition of their claims in a class action will provide substantial
2    benefits to the parties and the Court.  Record owners and other members of the
3    Class may be identified from records maintained by Daimler or its transfer agent,
4    and may be notified of the pendency of this action by a combination of published
5    notice and first-class mail, using the techniques of notice similar to that
6    customarily used in class actions arising under the federal securities laws.

7        178.   There is a well-defined commonality of interest in the questions of
8    law and fact involved in this Case.  Questions of law and fact common to
9    members of the Class that predominate over questions that may affect individual
10   Class members include:

11       (a)   whether Defendants' actions as alleged herein violated the
12   federal securities laws;

13       (b)   whether Defendants' statements and/or omissions issued
14   during the Class Period were materially false and misleading;

15       (c)   whether Defendants knew or were deliberately reckless in not
16   knowing that their statements were false and/or misleading;

17       (d)   whether and to what extent the market prices of Daimler
18   ADRs were artificially inflated and/or distorted before and/or during the
19   Class Period due to the misrepresentations and/or omissions of material
20   fact alleged herein; and

21       (e)   whether and to what extent Class members sustained damages
22   as a result of the conduct alleged herein, and the appropriate measure of
23   any such damages.

24       179.   Lead Plaintiff's claims are typical of the claims of the other members
25   of the Class, as all members of the Class purchased or otherwise acquired
26   Daimler ADRs during the Class Period and similarly sustained damages as a
27   result of Defendants' wrongful conduct alleged herein.  Lead Plaintiff will fairly

28

and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intends to prosecute this action vigorously.  Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

180.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for individual Class members to seek redress for the wrongful conduct alleged herein.  Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XI.  LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

181.  Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)  the omissions and misrepresentations were material;

(c)  Daimler ADRs traded in efficient markets;

(d)  the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Daimler ADRs; and

(e)  without knowledge of the misrepresented or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise acquired Daimler ADRs between the time that Defendants made material

misrepresentations and omissions and the time the concealed risks materialized or the true facts were disclosed.

182.   At all relevant times, the market for Daimler ADRs was open and efficient for the following reasons, among others:

(a)   Daimler regularly communicated with public investors via established market communications mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as securities analysts, and other similar reporting services;

(b)   Daimler was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(c)   Daimler ADRs met all of the requirements for trading, and were actively traded on highly efficient over-the-counter markets under the ticker symbols "DDAIY" and "DDAIF."

183.   As a result of the foregoing, the markets for Daimler ADRs promptly digested current information regarding Daimler from all publicly available sources, and the prices of Daimler's ADRs reflected such information.

184.   Based upon the materially false and misleading statements and omissions of material fact alleged herein, Daimler ADRs traded at artificially inflated prices during the Class Period.  Lead Plaintiff and the other members of the Class purchased Daimler ADRs relying upon the integrity of the market price of Daimler ADRs and other market information relating to Daimler.  Under these circumstances, all purchasers of Daimler ADRs during the Class Period suffered

similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

185.   Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by the law and in the Company's publicly available financial statements. Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Daimler ADRs at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.   CAUSES OF ACTION

### COUNT I

### Asserted Against All Defendants for
### Violations of Section 10(b) of the Securities Exchange
### Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder

186.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead Plaintiff and all other members of the Class against Daimler and the Individual Defendants.

187.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the intrinsic value of Daimler ADRs, as alleged herein; (ii) artificially inflate the price of Daimler ADRs, and (iii) cause Lead Plaintiff and other

1    members of the Class to purchase Daimler ADRs at artificially inflated prices that

2    did not reflect their true value.  In furtherance of this unlawful scheme, plan, and

3    course of conduct, Defendants took the actions set forth herein.

4        188.  Defendants directly and indirectly, by the use of means and

5    instrumentalities of interstate commerce, the mails, and/or the facilities of a

6    national securities exchange: (i) employed devices, schemes, and artifices to

7    defraud; (ii) made untrue statements of material fact and/or omitted material facts

8    necessary to make the statements not misleading; and (iii) engaged in acts,

9    practices, and a course of business that operated as a fraud and deceit upon the

10    purchasers of Daimler's ADRs in an effort to maintain the artificially inflated

11    price of Daimler ADRs in violation of Section 10(b) of the Exchange Act, and

12    Rule 10b-5 promulgated thereunder.

13        189.  Defendants employed devices, schemes, and artifices to defraud

14    while in possession of material adverse nonpublic information and engaged in

15    acts, practices, and a course of conduct as alleged herein in an effort to assure

16    investors of Daimler's value and performance, which included the making of

17    untrue statements of material facts and omitting material facts necessary in order

18    to make their statements, in light of the circumstances under which they were

19    made, not misleading, as set forth more particularly herein.  Defendants did not

20    have a reasonable basis for their alleged false statements and engaged in

21    practices, and a course of business which operated as a fraud and deceit upon the

22    purchasers of Daimler ADRs during the Class Period.

23        190.  Defendants are liable for all materially false and misleading

24    statements and omissions made during the Class Period, as alleged above,

25    including the false and misleading statements and omissions included in press

26    releases, conference calls, public filings, news media, blogs, and Daimler's

27    website.

28

191.   Defendants are further liable for the false and misleading statements made by Daimler's officers, management, members of the Board of Management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and Daimler's website, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

192.   Defendants' material misrepresentations and/or omissions were done knowingly or with deliberate recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of Daimler ADRs.  By concealing material facts from investors, Defendants maintained the Company's artificially inflated ADR prices throughout the Class Period.

193.   In ignorance of the fact that the price of Daimler ADRs was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the ADRs trade, and/or on the absence of material adverse information that was known to or with deliberate recklessness disregarded by Daimler but not disclosed in public statements by Daimler during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired Daimler ADRs during the Class Period at artificially inflated prices and were damaged when that artificial inflation was removed from the price of Daimler ADRs.

194.   At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.   Had Lead Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the intrinsic value of Daimler ADRs, Lead Plaintiff and other members of the Class would not have purchased or acquired their Daimler ADRs, or, if they had

purchased or acquired their Daimler ADRs during the Class Period, they would not have done so at the artificially inflated prices they paid.

195.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

196.   As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Daimler ADRs during the Class Period.

## COUNT II

**Asserted Against the Individual Defendants and Daimler for Violations of Section 20(a) of the Securities Exchange Act of 1934**

197.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.   This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class against the Individual Defendants.

198.   At all relevant times during the Class Period, Defendant Zetsche was the Chairman of the Board of Management of Daimler AG and Head of Mercedes-Benz Cars division; Defendant Uebber was a Member of the Board of Management of Daimler AG and Head of Finance & Controlling and Mergers & Acquisitions for Daimler; and Defendant Weber was a Member of the Board of Management of Daimler AG and Head of Group Research & Mercedes-Benz Cars Development.   As such, the Individual Defendants had regular access to non-public information about Daimler's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings of the Company's Board and committees

thereof, as well as reports and other information provided to them in connection therewith.

199.   The Individual Defendants acted as controlling persons of Daimler within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Daimler's day-to-day operations, and/or knowledge of statements made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiff alleges were false and misleading at the time they were made.

200.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

201.   In particular, each of these Individual Defendants had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

202.  Defendant Daimler likewise acted as a controlling person of MBUSA within the meaning of Section 20(a) of the Exchange Act as alleged herein.   By virtue of the fact that MBUSA was Daimler's wholly owned subsidiary, and by virtue of Daimler's direct participation in and/or awareness of MBUSA's day-to-day operations, and/or knowledge of statements alleged herein

to be false and misleading which were disseminated to the investing public, Daimler had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MBUSA and its executives, including the content and dissemination of the various statements that Lead Plaintiff alleges were false and misleading at the time they were made.

203.   As set forth above, Daimler, MBUSA and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants and Daimler are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Daimler ADRs during the Class Period.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding  Lead Plaintiff and the members of the Class damages and interest thereon;

C.     Awarding Lead Plaintiff's and the Class's reasonable costs, including attorneys' and experts' fees; and

D.     Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XIV.  JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

Dated:  October 11, 2016

LABATON SUCHAROW LLP

By:     /s/ James W. Johnson
        James W. Johnson
        Michael H. Rogers
        Matthew J. Hrutkay

        *Attorneys for the Public School
        Retirement System of the School
        District of Kansas City, Missouri and
        Lead Counsel for the Proposed Class*

        GLANCY PRONGAY &
          MURRAY LLP
        Joshua L. Crowell

        *Liaison Counsel for the Public School
        Retirement System of the School
        District of Kansas City, Missouri and
        Liaison Counsel for the Proposed Class*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I, the undersigned, declare:

I am over the age of 18 and not a party to the within action.  My business address is Labaton Sucharow LLP, 140 Broadway, New York, New York 10005.

On October 11, 2016, I served true and correct copies of the following:

- **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

on all parties through counsel who have appeared in this matter through posting of these documents to the ECF website of the U.S.D.C. Central District of California.

I declare under penalty of perjury that the foregoing is true and correct. Executed at New York, New York on October 11, 2016.

<div style="display:flex; gap:2em;">

James W. Johnson  
(Type or Print Name)

/s/James W. Johnson  
(Signature)

</div>

# Mailing Information for a Case 2:16-cv-02942-SJO-KS Vancouver Alumni Asset Holdings, Inc. v. Daimler AG et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Eric J Belfi**
  ebelfi@labaton.com

- **Matthew Joseph Hrutkay**
  mhrutkay@labaton.com,lmehringer@labaton.com,smundo@labaton.com

- **James W Johnson**
  jjohnson@labaton.com

- **Christopher J Keller**
  ckeller@labaton.com

- **Francis P McConville**
  fmcconville@labaton.com,sjessee@labaton.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

- **Michael H Rogers**
  mrogers@labaton.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Michael W Stocker**
  mstocker@labaton.com,drogers@labaton.com,ravan@labaton.com,lmehringer@labaton.com,ckeller@labaton.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`